[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
November 18, 2005
THOMAS  K. KAHN
CLERK

_____

No. 05-12107
Non-Argument Calendar

_____

D. C. Docket No. 04-00101-CR-FTM-29-SPC

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOSE MANUEL GONZALEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(November 18, 2005)

Before CARNES, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Jose Manuel Gonzalez appeals his total 93-month[1] sentence, imposed after he pled guilty to one count of conspiracy to commit robbery and one count of carrying a firearm during a crime of violence, violations of 18 U.S.C. §§ 1951(a) and 924(c)(1)(A)(i), respectively. On appeal, he argues that he was entitled to a two-level minor role reduction pursuant to U.S.S.G. § 3B1.2. For the reasons set forth more fully below, we affirm.

Gonzalez pled guilty before a magistrate to the above-referenced offenses. According to the undisputed facts in the presentence investigation report (PSI), the offense conduct began around August 25, 2004, when an undercover ATF agent told Renato Lebron that he was a disgruntled courier for a Colombian narcotics trafficking organization looking for a home-invasion crew capable of robbing a narcotics stash house, and that the agent could meet with Lebron in a few weeks to discuss the plan.

On September 8, the agent met with Lebron, and asked Lebron if he were capable of robbing the Colombians' stash house, to which Lebron responded that he had done "big jobs" before. The agent provided details to Lebron, and informed him of when the next delivery was scheduled to arrive. Lebron wanted to know the address of the stash house, but the agent indicated that the address would not be

[1] This total sentence represents the guidelines calculation with respect to Count 1 and the mandatory 60-month consecutive sentence with respect to Count 2. (See R3 at 12, 15; R1-90 at 2).

known until 30 minutes before the scheduled pick up.  Lebron told the agent that he had two associates who would assist him with the robbery, and stated he had the people, the pistols, and everything else he needed to complete the robbery. Lebron and the agent agreed to split the proceeds of the robbery, and Lebron indicated that his plan was to enter the stash house behind the agent, otherwise they would have to enter as impersonating police officers.

Less than a week later, a CI informed ATF agents that Lebron had recruited four individuals to assist him with the robbery, and reported that Lebron had two nine-millimeter pistols with silencers, a machine pistol with silencer, a bullet proof vest and masks, and a police interceptor, which was to be used as the getaway car. Later, the CI informed agents that Lebron had indicated that firearms, silencers, and vests would be used by the four individuals conducting the robbery, and that Lebron had no intention of sharing the proceeds.

On October 6, the agent met with Lebron, who indicated that cocaine would be arriving on October 8.  Lebron stated that his crew would be armed, and that his plan was to infiltrate the stash house as the agent was exiting.  During the meeting, Margarito Cruz Sanchez arrived and greeted Lebron and the agent, who, after receiving Lebron's approval, told Sanchez and Lebron about the undercover scenario.

3

On October 8, surveillance agents observed Lebron, Benjamin Gutierrez, Gonzalez, and Sanchez arrive at a personal storage facility in Naples, Florida. Sanchez was driving a white Cadillac, with Gonzalez in the front passenger seat and Lebron and Gutierrez in the backseat. Gonzalez remained in the car while the other three passengers exited. The agent then arrived and opened the driver's side door, communicating to all of the individuals, including Gonzalez, that there would be two individuals in the stash house, one of whom was armed. Gonzalez was seen nodding his head in an affirmative manner while listening. Lebron explained that, as the agent exited the stash house, he would "tie up" the agent, at which point Gutierrez would put a gun to the agent's head and demand that he comply. The agent indicated that the guards at the stash house would likely shoot back if Lebron or a member of his crew fired first.

As the agent began walking away, law enforcement arrived on the scene, arresting Lebron, Gutierrez, Gonzalez, and Sanchez. A search of the Cadillac revealed a loaded .9mm semi-automatic pistol, a .380 caliber semi-automatic pistol, and three particle masks, as well as four latex gloves. After being advised of his rights, Lebron stated that he had discussed the plan with each member of the conspiracy, and stated that each person had an assigned job, Gonzalez's task being to stay with the getaway car. Gonzalez, in a post-arrest statement, disclosed that

4

Lebron had asked him, on October 7, if he wanted to drive and make some money. On October 8, Gonzalez went to Lebron's home, met with Lebron, Gutierrez, and Sanchez, and they drove to a convenience store, where Gonzalez noticed the guns in the car.

At his plea colloquy, Gonzalez admitted that he knew that there was going to be a robbery. He recalled seeing the guns in the car approximately five minutes before arriving at the storage facility, and that the guns were behind the front passenger's seat. Gonzalez stated that his job was to drive the getaway car and that, initially, he did not know who or what was going to be robbed. It was not until they were on their way to the storage facility that Gonzalez learned that drugs were the target of the robbery. Gonzalez stated that he was never supposed to go to the residence or the place where the robbery was to take place, and that his only job was to drive the other defendants to a place, drop them off, and then pick them up. For his part, Gonzalez was supposed to receive $5,000. Finally, Gonzalez stated that he believed the guns in the car were going to be used in the robbery. The district court accepted Gonzalez's plea as knowing and voluntary.

The PSI did not group Count 1 (robbery) with Count 2 (carrying a firearm during a crime of violence) to avoid double counting and, because Count 2 carried a statutorily mandated consecutive sentence, only calculated a guideline range for

5

the robbery charge. As to the robbery count, the PSI set Gonzalez's base offense level at 20, pursuant to U.S.S.G. § 2B3.1(a). Gonzalez's offense level was not enhanced for the possession of a firearm because of the separate firearm charge under 18 U.S.C. § 924(c), but a one-level enhancement was added because the taking of cocaine was the object of the offense, pursuant to U.S.S.G. § 2B3.1(b)(6). The PSI next determined that Gonzalez's role in the offense was that of an "active and average participant," and he was not given either an aggravating or mitigating role adjustment. Gonzalez was then credited with a three-level reduction for acceptance of responsibility under § 3E1.1 for a total offense level of 18. With no criminal history, Gonzalez was a category I, which, at offense level 18, provided for an advisory sentencing range of 27-33 months' imprisonment, with a mandatory 60-month sentence to be imposed consecutively for Count 2.

Gonzalez lodged only one objection to the PSI, arguing that he was a minor participant in the offense and should receive a two-level reduction under U.S.S.G. § 3B1.2(b). At sentencing, Gonzalez argued that (1) he was substantially younger than his codefendants; (2) his only role was as a driver, not an active participant in the robbery itself; and (3) his role was minor compared to other participants, like Gutierrez, who was involved in negotiations and was to actively participate in the robbery by holding a gun to the agent's head.

6

The district court ruled against Gonzalez, finding that:

Certainly, Mr. Gonzalez's role is different than the other three participants; but I agree . . . that it was both active and integral to the success. He was going to be the getaway driver, and I don't see that role being . . . substantially different than the roles of Mr. Sanchez and Mr. Gutierrez. Mr. Lebron is a different situation, but . . . the Court finds that the defendant should not be entitled to a minor role.

Thus, the court overruled Gonzalez's objections and adopted the factual findings and application of the guidelines as set forth in the PSI. Based on those findings, it found Gonzalez's total offense level to be 18, his criminal history category to be I, with a resulting range of 27 to 33 months' imprisonment as to Count 1, and an additional 60-month consecutive sentence required for Count 2. After hearing from both Gonzalez and the government as to an appropriate sentence for Count 1, the district court sentenced him to 33 months' imprisonment to be followed by a 60-month consecutive sentence on Count 2, for a resulting sentence of 93 months' imprisonment.

On appeal, Gonzalez argues that he was less culpable than most of the other participants because the entire offense was arranged, planned, and discussed among law enforcement and the other participants, not Gonzalez. He argues that he had no role in the decision-making process, was told solely to stay in the vehicle and serve as a getaway driver, and only joined the conspiracy at the very last moment when told he could make some money by driving. Gonzalez argues that

7

he was made aware of the basic components of the offense just prior to being arrested, and that requiring him to establish more to qualify for the reduction would misinterpret the guideline and its purpose. He argues that, even though the guidelines are no longer binding, the proper remedy would be a remand because the guidelines were incorrectly calculated.

"[A] district court's determination of a defendant's role in the offense is a question of fact to be reviewed under the clearly erroneous standard." United States v. Rodriguez De Varon, 175 F.3d 930, 938 (11th Cir. 1999) (en banc). Under U.S.S.G. § 3B1.2(b), a defendant qualifies for a two-level reduction to his offense level if he was a minor participant in the offense. U.S.S.G. § 3B1.2(b). The guidelines further define a minor participant as one "who is less culpable than most other participants, but whose role could not be described as minimal." Id., comment. (n.5).

As we clarified in De Varon, when determining whether a minor-role reduction is warranted, a district court should consider (1) whether the defendant played a minor role in relation to the relevant conduct for which he was held accountable and (2) where appropriate, the culpability of the defendant as measured against that of other participants in the relevant conduct. De Varon, 175 F.3d at 940, 944. "[T]he conspiracy on which a defendant's base offense level is

8

founded is the relevant conspiracy for determining role in the offense." Id. at 942 (quotation omitted). "[T]he district judge is in the best position to weigh and assess both the defendant's role in her relevant conduct and the relative degrees of culpability of the other participants in that conduct. Intensely factual inquiries such as these are properly consigned to the experienced discretion of the district judge." Id. at 939.

We conclude that the district court did not clearly err by denying Gonzalez a minor-role reduction. The district court found that Gonzalez's role as a getaway driver, while different from the other codefendants, was still an integral to the success of the prospective criminal conspiracy to commit robbery. The relevant conduct for which he was held accountable was for robbery and having the objective of taking a controlled substance. Only because Gonzalez was separately charged and sentenced for aiding and abetting the carrying of a firearm during a violent crime did he avoid further accountability for it pursuant to U.S.S.G. § 2B3.1(b)(2)(C). However, the facts in the record indicate that Gonzalez was aware that a robbery was going to take place, aware that there were guns that were likely to be used during the commission of the robbery, aware that drugs were the object of the crime, and was poised to earn $5,000 for driving the getaway car after the commission of the crime. Indeed, the PSI reflects that Gonzalez nodded his

9

head affirmatively while the undercover agent gave instructions to codefendants.

While it is true that Gonzalez's role was not to personally carry a weapon or, in a literal sense, commit the actual robbery by entering the premises and stealing cocaine, his role in ensuring that the robbery was successful, i.e., by getting himself and his codefendants quickly and safely away from the scene for the sum of $5,000, made him as integral and average a participant as one actually committing the robbery itself. Cf. United States v. Pinkney, 15 F.3d 825, 828 (9th Cir. 1994) (persuasively noting that "one kind of average participant in a robbery would be the person who drove the robber to the scene and then drove him or her away again, and expected a share of the loot.").

Even though it has been argued that Gonzalez's role, limited as it was, might be worthy of a minor-role reduction, we have held that:

> In the final analysis, this decision falls within the sound discretion of the trial court. Indeed, we acknowledge that a similar fact pattern may on occasion give rise to two reasonable and different constructions. This is inherent in the fact-intensive inquiry specifically contemplated by the Guidelines. As the Supreme Court has recognized, a trial court's choice between 'two permissible views of the evidence' is the very essence of the clear error standard of review. So long as the basis of the trial court's decision is supported by the record and does not involve a misapplication of a rule of law, we believe that it will be rare for an appellate court to conclude that the sentencing court's determination is clearly erroneous.

De Varon, 175 F.3d at 945 (citation omitted).

10

Based on the foregoing, we conclude that the district court's finding that Gonzalez's role was integral to the success of the criminal conspiracy and, therefore, not substantially different from the roles of Sanchez and Gutierrez, is amply supported by the record and is not clearly erroneous. We, therefore, affirm.

**AFFIRMED.**